Filed 9/1/15  In re S.M. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.M., a Person Coming Under the Juvenile Court Law. | B258808 |
| | (Los Angeles County Super. Ct. No. DK05498) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>C. M.<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Frank H. Free, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

C.M. (father) appeals from the dependency court's dispositional order regarding his daughter, S.M. (born in 2012). Father contends the court erred in removing S.M. from his custody pursuant to Welfare and Institutions Code section 361, subdivision (c)(1).[1] We affirm.

# FACTUAL AND PROCEDURAL HISTORY

*A. Initial Investigation and Detention*

Father and S.M.'s mother, M.B. (mother) are separated and have no other children.[2] The family came to the attention of the Department of Children and Family Services (DCFS) on May 1, 2014 based on a report of drug abuse by mother and her current significant other, N.V. The reporting party alleged that mother would lock herself in the bathroom to consume methamphetamine, either leaving S.M. unattended or consuming the drugs in the child's presence, and that N.V. was "affiliated with street gangs and sells drugs."

When DCFS informed mother of the allegations, she admitted to consuming marijuana in the past and to currently using methamphetamines. Mother stated that she was "attempting to stop using methamphetamines" and that she had let S.M. live with father and the maternal grandparents for several weeks so that she could "focus on not using the drug." Mother denied using drugs in S.M.'s presence or leaving S.M. alone while she did so. She also denied that N.V. was using methamphetamines. Mother claimed that father previously had used methamphetamines on an infrequent basis and presently smoked marijuana, including doing so in S.M.'s presence. Mother indicated that she was willing to work with DCFS to participate in a substance abuse program.

---

[1] Statutory references herein are to the Welfare and Institutions Code unless otherwise indicated.

[2] Mother is not a party to this appeal.

N.V. admitted consuming methamphetamines and marijuana but claimed he never did so in mother's or S.M.'s presence.  He denied that he or mother ever cared for S.M. while under the influence of narcotics.  He also reported having a criminal arrest history and drug-related convictions.  N.V. agreed to enroll in a substance abuse program.

Mother and N.V. submitted to toxicology screening on May 9, 2014.  Mother tested negative; N.V. tested positive for cannabinoids.  Mother then tested positive for methamphetamines in a screening on May 21, 2014.

The investigating Children's Social Worker (CSW) interviewed father on May 26, 2014.  Father stated that he was concerned about S.M.'s well-being, as mother had admitted to him several weeks previously that she was having "issues with consuming methamphetamines" and left S.M. in his care.  After several weeks, he and mother agreed that she would move in with him and S.M. at the paternal grandparent's home.  Mother then disappeared for two days.  When she returned, she stated that she had changed her mind and did not want to reconcile.  Father refused to allow mother to take S.M. back to her home because of mother's substance abuse problems.  He took S.M. to the maternal grandparents' home so she could spend time with them.

A week later, according to father, mother and N.V. came to father's home with S.M. but refused to allow father to hold the child.  Father claimed that N.V. hit him over the head with a laundry basket and they became involved in a "scuffle."  Father stated he did not retaliate because he did not want S.M. "to be exposed to violence."  He claimed that mother had been keeping S.M. away from him since the altercation. According to N.V. and mother, father instigated the altercation by pushing mother to get to S.M.

Both parents reported prior incidents of domestic violence with each other.  Father alleged an incident in which mother threatened him with either a kitchen knife or a pair of scissors in S.M.'s presence.  Mother denied this allegation and claimed that "when she and father would get involved in arguments he would threaten himself with a kitchen knife as a way to control her, an allegation father denied."  Mother also reported an incident in February or March 2014, where father entered her apartment through a

3

window holding a pocket knife.  Mother claimed father stopped "advancing toward" her when he saw N.V., that the maternal grandmother intervened and "held father back," and that the police responded but did not issue a report.  According to father's version of this incident, mother was staying at his home and had told him that N.V. was "stalking her, breaking into her apartment and supplying her with drugs."  Mother left father's home at 9:00 p.m. to gather some things from her apartment.  At midnight, father and maternal grandmother went to mother's apartment to check on her.  Father saw mother and N.V. inside and entered through the window "because he thought mother was in fear for her safety and he was holding a box cutter for protection."[3]  N.V. then denied that he was harassing mother and mother admitted that she had lied to father about mistreatment by N.V.  Both parents reported that S.M. was at father's home during this incident.

Father denied using methamphetamines but admitted to using marijuana occasionally pursuant to a prescription.  He tested positive for cannabinoids on June 2, 2014.

B. *Section 300 Petition and Detention Hearing*

On June 13, 2014, DCFS filed a petition under section 300, subdivisions (a) and (b), alleging that S.M. was placed at risk of physical harm due to the history of domestic violence between mother and father (paragraph a-1) and violent altercations between father and N.V., including in S.M.'s presence (paragraph a-2).  The petition further alleged that mother and father failed to adequately protect S.M., based on drug abuse by mother, father, and N.V. (paragraphs b-1, b-2, and b-4) and the same allegations regarding physical altercations between mother and father, and father and N.V. (paragraphs b-3 and b-5).  DCFS noted that S.M. appeared to be in good general health, and recommended that she be allowed to remain with mother.

The dependency court found a prima facie case was established for detaining S.M. pursuant to section 300, subdivisions (a) and (b).  The court released S.M. to her parents'

---

[3] Father alternately refers to the instrument he was holding as a "box cutter" and a "knife."

4

custody and allowed N.V. to remain in mother's home "as long as he is testing clean and is attending a drug program." The court further ordered family maintenance services and ordered the parents to attend counseling and submit to random weekly drug and alcohol testing.

*C. Adjudication*

DCFS filed its jurisdiction/disposition report (jurisdiction report) dated July 15, 2014. The CSW reported that he had been unable to conduct a further interview with mother, as she had failed to return his phone calls. Father was interviewed on July 7, 2014. He again admitted to engaging in physical altercations with mother and that S.M. was present during several of these altercations, but denied that he failed to protect the child. Father insisted that mother was the primary aggressor and that he "would only attempt to subdue mother in order to prevent being injured." Father also stated that he "pushed [mother] down once" and would "let her hit me sometimes," but they "worked it out." He admitted that "[S.M.] was around sometimes . . . one time I actually grabbed [S.M.] so she wouldn't come after me . . . she hit me on the back of the head; like a slap . . . [S.M.] got scared but didn't cry loudly."

With respect to the box cutter incident, father told DCFS that he "did not threaten anybody" and that he had a "box cutter from work" that he brought "for safety." When mother did not respond to his phone calls, he went to her apartment, peeked in, and saw N.V. inside "shirtless. . . . I went in through the window and he started approaching me and that's when I pulled the box cutter out. I didn't threaten [mother] at all. . . . I just had the knife out but didn't flash it in his face or anything like that." Father stated that "it didn't get out of hand; I calmed down and [mother] just started laughing."

Father also admitted to engaging in verbal and physical altercations with N.V. and that S.M. was present for some of those incidents. Father claimed that N.V. was "the instigator and main aggressor" during these incidents. He described the laundry basket incident as instigated by mother, who arrived at his residence in a car with N.V. and S.M. and then "shoved me with her hip," and by N.V., who "told me to back up and to get out

5

of there" and then "grabbed a laundry basket . . . and hit me. . . . I told him he was a bum and I pushed him." Father and N.V. then "exchanged blows." Father claimed he called the police, but "they couldn't do much" and that S.M. witnessed the fight from the car and "started crying."

DCFS also noted that mother had not been participating in her drug rehabilitation program and had tested positive for amphetamine and methamphetamine. Due to the domestic violence and substance abuse, "mother's failure to comply and [S.M.'s] young age," DCFS recommended that S.M. be removed from mother and father.

In a last minute information for the court, DCFS noted that N.V. and father had failed to appear for scheduled drug and alcohol screenings on July 7 and 9, 2014, respectively.

The adjudication hearing was held on July 15, 2014. By agreement of the parties, the court struck the allegations of serious physical harm pursuant to section 300, subdivision (a) (paragraphs a-1 and a-2 of the petition). The court also struck the allegations regarding a failure to protect pursuant to section 300, subdivision (b), regarding father's history of substance abuse and father and N.V.'s history of violent altercations (paragraphs b-2 and b-5 of the petition). The court sustained the allegations of failure to protect based on mother's substance abuse, the history of violent altercations between mother and father (specifically noting the box cutter incident), and mother's creation of a "detrimental and endangering home environment" for S.M. by allowing N.V. to reside there (paragraphs b-1, b-3 and b-4).[4] At father's request, the allegations of paragraph b-3 were amended to replace the word "knife" with the phrase "box cutter."

Counsel for DCFS noted its concerns with father's failure to submit to the recent drug test. Father's counsel stated that father had missed the test due to a work conflict and that father understood the importance of testing. The court detained S.M. from both parents, continued the disposition hearing, and ordered DCFS to hold an emergency

_____

[4] The record indicates that mother and N.V. had married by the time of the jurisdictional hearing.

Team Decision Meeting (TDM) with mother and father within 48 hours. The court gave DCFS discretion to release S.M. to father based on the outcome of the TDM. N.V. was ordered to have no contact with the child.

### D. Disposition

DCFS filed a last minute information on August 12, 2014 regarding the TDM held on July 18, 2014. In addition to mother, father, and N.V., the paternal and maternal grandmothers, a paternal uncle and aunt, and a maternal aunt were also present at the meeting. DCFS noted that the paternal uncle and aunt "were the most neutral and appropriate participants during the meeting." On the other hand, DCFS reported "there continues to be acrimony between the parents" and that most of the family members at the meeting, particularly N.V., "appeared to be more interested in making accusations against each other," than in focusing on S.M.'s well-being. The maternal relatives and N.V. were reported to have acted "unruly," and N.V. was "confrontational and accusatory towards father and instigated conflict between the participants." DCFS concluded that "the parents' immaturity, ongoing feud and disdain for one another would place [S.M.] at risk of further exposure to domestic disputes if released to the father's care."

DCFS also reported that father enrolled in a 52-week Batterers' Intervention Program on July 22, 2014 and that both father and mother had recent negative drug screening results.

The disposition hearing was held on August 12, 2014. Father was present, mother and N.V. were not. Counsel for S.M. agreed with the DCFS recommendation regarding detention from mother, given her lack of progress, but requested the child be released to father. He argued that there were reasonable means to mitigate any risk of harm to S.M., as father had enrolled in a domestic violence program and had provided consistently negative drug test results. Further, the relationship between mother and father had ended and there were means to ensure a "safe distance" between father, mother, and N.V. (the "primary antagonist"), including having visitation pick up and drop off at a neutral location. Thus, S.M.'s counsel opined that she could safely be returned to father's home

"with continued supervision and safety precautions put in place." Father's counsel agreed, noting that the detention at the jurisdiction hearing occurred primarily due to concerns over father's and mother's failure to submit to drug testing and failure to enroll in programs, but that father had now "addressed both of those concerns" and was long ago separated from mother. She also indicated that father was prepared to file a restraining order against N.V. and would agree to a stay away order between mother and father, as well as unannounced home visits by DCFS. Counsel also noted that father was living with his relatives, who were supportive and noted by DCFS to be "calm and collect[ed]" at the TDM.

The court asked father's counsel whether she had "some authority to allow me to issue a restraining order for someone who is not a party," (i.e., N.V.). She responded that she did not "off the top of my head," but indicated that father was willing to "go to criminal court or another court" to seek the appropriate order restraining N.V. The court then asked counsel to "explain to me how we would be able to do any kind of visitation with the mother given these conflicts and [N.V.] [sic] to keep the child and the father safe." Counsel noted that there were often cases where the parents did not get along, and that the parties could conduct visitation or exchanges at a neutral location, such as a police station or the DCFS office, to minimize the conflict, and that "there are many options for a safe exchange of [S.M.] particularly given DCFS involvement in this case."

The court stated that "this is really over the top with domestic violence. . . . When someone pulls a weapon out . . . that brings it up to another level because of the legality of something like that. A box cutter is still a knife for the purposes of a threat and . . . to inflict serious injury. . . . And so I can't turn a blind eye to that." The court acknowledged that father was "doing better and is drug testing" as a "good step forward, but that doesn't mean that the risks have been eliminated. . . . I believe you're on the right track, but you're going to have to go a lot farther down the track before I can say that there's not a risk to this child." Noting that "it's always going to be a risk of some kind of conflict with the mother and [N.V.]," the court cautioned father that "even if you

8

have an agreement to meet and exchange the child at a police station, you will still have to have a restraining order that keeps [N.V.] out of the lobby while you and the mother exchange the child. So there's still a lot of work left to do."

Thus, the court found by clear and convincing evidence that S.M. would be placed at substantial risk of harm if returned to her parents and that there was no reasonable means by which to keep S.M. safe without removal from mother and father's custody. The court ordered family reunification services for both parents, as well as monitored visitation, with discretion to DCFS to grant unmonitored visitation to father as appropriate. Both parents were further ordered to participate in a domestic violence program, parenting classes, and drug testing.

Father timely appeals the court's dispositional order removing S.M. from his custody.[5]

## DISCUSSION

### A. Standard of Review

At the disposition stage, a dependency court "must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.) In order to remove a child from his or her parents' custody, the court must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) "A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a

---

[5] While this appeal was pending, the dependency court held a hearing on February 10, 2015 and ordered S.M. placed with mother under DCFS supervision. The court ordered monitored visitation for father, with discretion to the department to liberalize, ordered no contact between S.M. and N.V., and set a further hearing for August 12, 2015 DCFS filed an unopposed request that we take judicial notice of the minute order of the February 10, 2015 hearing. We deny that request, as this information is irrelevant to the trial court's disposition and irrelevant to the issues on appeal.

9

potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*In re N.M., supra,* 197 Cal.App.4th at pp. 169-170.)

The clear and convincing standard "is a heightened standard of proof from the required preponderance of evidence standard for taking jurisdiction over a child. [Citations.]" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).) Nevertheless, "[t]he standard of review of a dispositional order on appeal is the substantial evidence test. [Citation.] In assessing this assignment of error on appeal, the substantial evidence test remains the appropriate standard of review, 'bearing in mind the heightened burden of proof.' [Citation.] We consider the entire record to determine whether substantial evidence supports the juvenile court's findings. [Citation.]" (*Hailey T., supra*, 212 Cal.App.4th at p. 146.) "[W]e do not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence. Instead, we review the record in the light most favorable to the juvenile court's order to decide whether substantial evidence supports the order. [Citation.]" (*Id.* at pp. 146-147.)

### B. Count b-3

Father contends that the dependency court erred in finding that there would be a substantial risk of harm to S.M. if she remained in his custody. We disagree.

Evidence of domestic violence may support removal of a child, as physical altercations between parents can create a ""substantial risk" of encountering the violence and suffering serious physical harm or illness from it." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.) For example, a child "could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg. . . ." (*Ibid.*; see also *In re T.V.* (2013) 217 Cal.App.4th 126, 136 ["Although T.V. had not been physically injured and was otherwise healthy, the court could reasonably find she was at substantial risk of harm as a result of the parents' ongoing domestic violence and there

were no reasonable means by which she could be protected without removal."].) Here, contrary to father's assertion, there was substantial evidence in the record of a risk of harm to S.M. arising from the domestic violence between father and mother. Both mother and father admitted multiple incidents of domestic violence with each other, including the use of scissors and knives by both parents. Father admitted to pushing mother down on at least one occasion, and to grabbing S.M. so that mother "wouldn't come after me," which frightened S.M. and made her cry. These incidents demonstrated a substantial risk of harm to S.M.

Additionally, father's suggestion that the domestic violence was not ongoing, as he was separated from mother, is belied by the record. The box cutter incident, in which father admits to gravely concerning conduct—entering mother's home through a window, late at night and holding a box cutter—occurred just a few months prior to the initiation of dependency proceedings, and long after father and mother had reportedly separated. And while father claims he did not threaten anyone with the weapon, he admits that he "pulled the box cutter out" in the presence of mother and N.V., and mother claims that father was "advancing toward" her until the maternal grandmother held him back. Although this particular incident did not place S.M. at risk of any physical harm, as she was not present in mother's home at the time, it constitutes evidence of serious ongoing domestic violence between father and mother. Similarly, DCFS noted continuing disputes between father, mother, and N.V. as recently as the TDM and concluded that such continuing hostility would place S.M. at risk. The dependency court did not err in relying on that evidence to conclude that S.M. could not be safely returned to father.

The court acknowledged that father had started on the "right track" by enrolling in domestic violence classes and submitting clean drug tests, but it noted that there was "still a lot of work left to do" to minimize the risk to S.M. from the ongoing conflict between father, mother, and N.V. Substantial evidence supports the court's conclusion.

11

Father had only recently enrolled in domestic violence classes as of the dispositional hearing and, while he indicated a willingness to seek a restraining order against N.V., had not yet done so. Although father offered several suggestions regarding exchanging S.M. in a neutral setting, the court was entitled to credit the evidence of protracted, ongoing violence between mother, father, and N.V., often in the presence of the child, and conclude that father's proposals did not adequately mitigate the risk of harm. Under the circumstances, and particularly in light of S.M.'s young age and inability to protect herself, the evidence supports the court's finding that no reasonable means existed to protect S.M. absent removing her from father's custody.

## DISPOSITION

Affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.